IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOSEPH MIDDLETON                                                              PLAINTIFF

v.                              CIVIL NO. 20-2101

ANDREW M. SAUL, Commissioner
Social Security Administration                                                DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Joseph Middleton, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for supplemental security income (SSI) benefits under the provisions of Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.     Procedural Background**:

Plaintiff protectively filed his current application for SSI on February 5, 2016, alleging an inability to work due to a panic disorder, agoraphobia, a social disorder, schizophrenia, obesity, and a personality disorder. (Tr. 68-69, 192). An administrative hearing was held on September 18, 2018, at which Plaintiff appeared with counsel and testified. (Tr. 29-50).

By written decision dated July 3, 2019, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 14). Specifically, the ALJ found Plaintiff had the following severe impairments: an anxiety disorder, a panic

disorder, a personality disorder, and schizophrenia. However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 14). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to perform work where interpersonal contact is incidental to the work performed, where the complexity of tasks is learned and performed by rote, with few variables, and little judgment, and where the supervision required is simple, direct, and concrete.

(Tr. 16). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a hand packager, a conveyor feeder off-bearer, and a kitchen helper. (Tr. 21).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on April 23, 2020. (Tr. 1-5). Subsequently, Plaintiff filed this action. (Doc. 2). Both parties have filed appeal briefs, and the case before the undersigned for report and recommendation. (Docs. 14, 17).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

**II.    Evidence Presented:**

At the administrative hearing held before the ALJ on September 18, 2018, Plaintiff, who was forty-three years of age, testified that he had obtained a seventh grade formal education and had earned his GED. (Tr. 34). The record revealed Plaintiff had no past relevant work.

The pertinent medical evidence in this case reflects the following. On February 22, 2016, Erica Olson, LAC, at Dayspring Behavioral Health (hereinafter "Dayspring"), conducted a therapy review. (Tr. 347-354). Ms. Olson noted the review was based on the counseling session from the

previous week. Ms. Olson opined Plaintiff's strengths were his ability to communicate needs, wants and feelings. Plaintiff had indicated he needed medication and therapy. Ms. Olson noted Plaintiff had difficulty being around other people. Plaintiff reported he was interested in working on computers. Ms. Olson found that Plaintiff continued to need medication management and therapy services.

On March 31, 2016, Plaintiff was seen by Jody Barham, ANP, at Dayspring, for a medication check. (Tr. 355-356). Plaintiff reported that he and his wife had been fighting and might divorce. Plaintiff denied pain, passing out, syncopal episodes, or vertigo. Nurse Barham noted Plaintiff was clean and well groomed. Plaintiff denied experiencing delusions or hallucinations. Plaintiff's flow of thought was noted as logical, sequential, and developmentally appropriate. Plaintiff's mood was noted as euthymic and stable. Plaintiff's attention and concentration was noted as controlled and developmentally appropriate. Nurse Barham made no changes in Plaintiff's treatment plan.

On May 24, 2016, Plaintiff was seen by Ms. Olson for individual therapy. (Tr. 372-381). Ms. Olson noted Plaintiff appeared clean and groomed and was medication compliant. Plaintiff reported his chest had been hurting. Ms. Olson encouraged Plaintiff to seek treatment with his primary care physician. Plaintiff felt he had a bad temper and wanted to work on his anger. Plaintiff reported that he experienced two small panic attacks every day. Plaintiff indicated he wanted to re-establish a better relationship with his wife. Plaintiff believed his wife had schizophrenia.

On May 25, 2016, Plaintiff underwent a consultative general physical examination performed by Dr. Michael R. Westbrook. (Tr. 361-366). Plaintiff complained of a panic disorder, agoraphobia, and a social disorder. Plaintiff reported he was unable to walk more than one hundred feet before experiencing shortness of breath. Upon examination, Dr. Westbrook noted Plaintiff

exhibited a full range of motion in his spine and extremities. Dr. Westbrook noted there was no sign of muscle spasm, muscle weakness, muscle atrophy or sensory abnormalities. Plaintiff's gait and station were with normal limits. With respect to Plaintiff's limb function, Dr. Westbrook noted Plaintiff was able to hold a pen and write; to touch fingertips to palm; to oppose thumb to fingers; to pick up a coin; to stand/walk without assistive devices; and to walk on heel and toes. Plaintiff was unable to squat/arise from a squatting position due to low back pain. Plaintiff had full grip strength in both hands. Dr. Westbrook diagnosed Plaintiff with mental illness, schizophrenia, and anxiety. Dr. Westbrook opined Plaintiff had severe limitations.

On June 9, 2016, Dr. Nick Rios, a non-examining medical consultant, opined that Plaintiff did not have a severe mental impairment. (Tr. 75). Dr. Rios stated as follows:

> MER from prior filing and current PCP MER through 8/15 shows no hx of psychotic disorder, rather anxiety disorder, substance use related disorders, and personality disorder. MER shows clmt presents to formal psych tx in 9/15 and c/o hearing voices and paranoia. Clmt is dx with schizophrenia, agoraphobia, and unspecified personality disorder. F/U med mgmt. OVs in 1/16 and 3/16 show clmt's mood and affect are normal/stable and w/no thought/perceptual disturbance. MN impairments are well controlled with current treatment. The overall case file evidence does not indicate more than minimal limitation to basic work capacity. Not severe.

Id.

On June 17, 2016, Plaintiff was seen for individual therapy with Ms. Olson. (Tr. 382-384). Plaintiff denied experiencing medication side effects. Plaintiff reported feeling "jumpy." Ms. Olson noted Plaintiff appeared clean and groomed and that he was medication compliant. Plaintiff indicated that living at his dad's house was peaceful and quiet. Plaintiff reported his relationship with his wife had improved but that they still had arguments. Ms. Olson noted Plaintiff texted with his wife during the session. Ms. Olson gave Plaintiff handouts on fair fighting and discussed the five love languages. Plaintiff responded well to interventions.

On June 23, 2016, Plaintiff was seen by Nurse Barham for medication management. (Tr. 385-386). Nurse Barham noted Plaintiff was clean and well groomed. Plaintiff denied experiencing delusions or hallucinations. Plaintiff's flow of thought was noted as logical, sequential, and developmentally appropriate. Plaintiff's mood was noted as euthymic and stable. Plaintiff's attention and concentration were noted as controlled and developmentally appropriate. Nurse Barham made no changes to Plaintiff's treatment plan.

On July 7, 2016, Plaintiff was seen by Ms. Olson for individual therapy. (Tr. 388-390). Ms. Olson noted Plaintiff appeared clean and groomed and that he was medication compliant. Plaintiff reported he was doing "so so." Plaintiff indicated his racing thoughts were about the same. Plaintiff felt like his heart skipped a beat. Plaintiff reported he and his wife were having difficulty in their relationship again. Plaintiff reported he would like to go out of his house more which was encouraged by the therapist. Plaintiff was given a homework assignment of doing one outside activity a week. Plaintiff reported he had about three bad panic attacks a week. Ms. Olson discussed techniques to help with the attacks but noted Plaintiff did not appear interested in utilizing mindfulness.

On August 4, 2016, Plaintiff was seen by Ms. Olson for individual therapy. (Tr. 392-394). Ms. Olson noted Plaintiff appeared clean and groomed and that he was medication compliant. Plaintiff reported he was doing "so so." Plaintiff described "an overwhelming feeling" that the walls were closing in on him. Plaintiff reported "medicine really helps me." Plaintiff indicated that he did not hear voices but felt like people were talking about him. Plaintiff reported having difficulty when his sisters came to visit his dad. Plaintiff had not done his homework, going out and doing something fun. Plaintiff was urged to do a positive activity. Plaintiff reported he liked playing chess and starcraft on the computer. Plaintiff acknowledged things would get better.

On August 15, 2016, Plaintiff entered the Johnson Regional Medical Center emergency room complaining of a sore right leg. (Tr. 494-499). Plaintiff had a skin abscess that was drained. After being prescribed medication, Plaintiff, who was unaccompanied, was discharged and allowed to drive himself home.

On August 17, 2016, Dr. Dan Gardner, a non-examining medical consultant, opined that Plaintiff did not have a severe physical impairment. (Tr. 73-74). On February 6, 2017, after reviewing the records, Dr. Jim Takach affirmed Dr. Gardner's opinion. (Tr. 85).

On September 1, 2016, Plaintiff was seen by Leah Wilson, LPC, at Dayspring, for a diagnostic evaluation. (Tr. 318-325). Plaintiff reported that his mother, grandmother, and aunts all had schizophrenia and that this had been "eating" at him for a while. Plaintiff reported he hated going to the store because he felt people were talking about him. Plaintiff reported he had left full shopping carts in the checkout line due to paranoia. Plaintiff reported he would not eat at another person's home as he felt he might be poisoned. Plaintiff reported hearing voices in his head. Plaintiff also wanted help with his marriage. Plaintiff explained that the stress with his step-daughter was taking a toll on the marriage. Plaintiff reported increased panic when he was around a lot of people. It was recommended that Plaintiff participate in individual and group therapy.

On September 3, 2016, Plaintiff entered the Johnson Regional Medical Center emergency room complaining of a rash on his right arm. (Tr. 501-505). Plaintiff was diagnosed with impetigo, unspecified and prescribed Bactrim. Plaintiff was discharged in stable condition and allowed to drive himself home.

On September 12, 2016, Plaintiff was seen by Ms. Olson for individual therapy. (Tr. 395-405). Ms. Olson noted Plaintiff appeared clean and groomed and that he was medication compliant

Plaintiff reported his wife had left him. Plaintiff explained that his wife went wild and they split up. Plaintiff reported that his wife had "her ride stolen." Plaintiff reported he did not feel well and that he needed his medicine. Plaintiff reported he was turned down for disability and that he was going to file an appeal. Plaintiff asked about his wife's appointments. Ms. Olson encouraged Plaintiff to let his wife take responsibility for her own appointments. Plaintiff reported that his wife would not do anything and expected him to do everything.

On September 13, 2016, Plaintiff underwent a continuing care evaluation at Dayspring. (Tr. 406-410). Upon examination, Dr. Charles Lewis noted Plaintiff exhibited normal speech and mood. Plaintiff denied hallucinations. Plaintiff exhibited intact thought and was found to have adequate social skills. Plaintiff reported normal sleep. Dr. Lewis opined Plaintiff was doing well on the current regimen.

On October 12, 2016, Ms. Olson prepared a discharge summary as Plaintiff had repeatedly "no showed" for appointments. (Tr. 412-413).

On December 21, 2016, Plaintiff was seen by Dr. William Williams for a medication check. (Tr. 417-419). Plaintiff reported he had been going to Dayspring where they had diagnosed him with schizophrenia. Dr. Williams noted Plaintiff requested another referral to Dayspring because he had been discharged after missing too many appointments. After examining Plaintiff, Dr. Williams diagnosed Plaintiff with a generalized anxiety disorder and a mood disorder due to known physiological condition, unspecified. Dr. Williams adjusted Plaintiff's medications and referred Plaintiff to Counseling Associates.

On February 8, 2017, Dr. Sheri L. Simon, a non-examining medical consultant, completed a Mental RFC Assessment opining that Plaintiff was moderately limited in some areas of

functioning. (Tr. 88-91). On the same date, Dr. Simon completed a Psychiatric Review Technique Form opining that Plaintiff had no difficulties with understanding, remembering, and applying information; moderate difficulties interacting with others; mild difficulties in maintaining concentration, persistence and pace; and no difficulties with adapting and managing oneself. (Tr. 86). Dr. Simon stated as follows:

> The updated MER supports that claimant continues with the same diagnoses but with no evidence of mental health symptoms for many months. Nothing noted at the PCP visit after the mental health discharge note. He is capable of at least basic work.
>
> Overall, MER support capacity for work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled).

(Tr. 91).

On April 3, 2017, Plaintiff was seen by Dr. Williams for a check-up and medication refills. (Tr. 437-442). Plaintiff reported experiencing an increase in agitation. An examination of Plaintiff was unremarkable. Plaintiff's medication was refilled. Dr. Williams ordered lab work and requested Plaintiff return for a follow-up in one month.

On May 1, 2017, Plaintiff was seen by Dr. Scott Kuykendall for medication refills. (Tr. 434-436). Plaintiff reported he sometimes choked when trying to swallow the Seroquel. Plaintiff also reported that the Seroquel made him very sleepy and that he was not himself when he took the medication. An examination of Plaintiff was unremarkable. Dr. Kuykendall discontinued Seroquel but refilled his other medication.

On May 10, 2017, Plaintiff entered the Johnson Regional Medical Center emergency room complaining of chest pain. (Tr. 482-492). Karen Branch, CNP, noted Plaintiff was panicking and hyperventilating. Plaintiff reported his Klonopin was stolen the previous night and he had stopped

taking Seroquel three days ago. Plaintiff reported the individuals that stole his medication also put something in his tea. Plaintiff's symptoms improved with treatment and he was discharged in stable condition.

On May 31, 2017, Plaintiff was seen by Dr. John McAuley for a check-up and medication refill. (Tr. 432-433). Dr. McAuley noted Plaintiff's insurance would not cover Latuda. Dr. McAuley assessed Plaintiff with schizophrenia, unspecified, and nicotine dependence and prescribed medication. Dr. McAuley noted he gave Plaintiff enough Latuda samples to last about twelve weeks. It was recommended that Plaintiff follow-up with Dr. Williams in six weeks.

On June 1, 2017, Plaintiff entered the Johnson Regional Medical Center emergency room complaining of low back pain and poison ivy. (Tr. 516-521). Plaintiff reported he fell from a six-foot platform the previous day and now had low back pain that radiated down his legs. Plaintiff was also concerned about his exposure to poison ivy as he had fallen into sap. Upon examination, Dr. James Cotner noted Plaintiff had a normal back inspection with full range of motion. Plaintiff exhibited normal range of motion of the lower extremities. Plaintiff had a normal gait, normal memory, and normal deep tendon reflexes. Plaintiff was noted as having normal judgment, insight, and concentration. Plaintiff was assessed with low back pain and poison ivy. Plaintiff, who was unaccompanied, was treated and discharged with instructions to follow-up with his primary care physician if needed.

On June 28, 2017, Plaintiff was seen by Linda Blasingame, APRN, for a follow-up. (Tr. 428-431). Plaintiff complained of muscle spasms in his shoulder and upper back. Nurse Blasingame noted Plaintiff also needed his medication filled. Upon examination, Nurse Blasingame noted Plaintiff was well developed, well nourished, and in no acute distress. Plaintiff was in no obvious discomfort and maintained good eye contact. Plaintiff was noted as anxious.

Plaintiff was noted to have muscle spasm pain in his shoulder. Plaintiff was prescribed medication and instructed to use warm heat on his shoulder and to gently massage as tolerated.

On July 26, 2017, Plaintiff was seen by Dr. Williams for dental pain. (Tr. 425-427). Dr. Williams noted Plaintiff also needed his medication refilled. Plaintiff reported his pain level was a six out of ten. An examination of Plaintiff was unremarkable. Plaintiff's medications were refilled.

On September 18, 2017, Plaintiff was seen by Dr. Kuykendall to discuss his medications. (Tr. 457-459). An examination of Plaintiff was unremarkable. Dr. Kuykendall prescribed medication and encouraged Plaintiff keep his upcoming appointment at Dayspring.

On December 12, 2017, Plaintiff was seen by Dr. Williams for medication refills. (Tr. 454-456). Plaintiff also reported that he was in a lot of pain after having a tooth pulled. An examination of Plaintiff was unremarkable. Dr. Williams assessed Plaintiff with a generalized anxiety disorder and other chronic pain. Dr. Williams prescribed medication and requested a follow-up appointment in six months.

On January 25, 2018, Plaintiff was seen by April Wyatt, APN, for medication refills. (Tr. 451-453). Plaintiff was noted as stable and asymptomatic. Plaintiff had no complaints. An examination of Plaintiff was unremarkable. Nurse Wyatt noted Plaintiff had picked up Tramadol on January 17, 2018, so that medication refill was denied. Plaintiff's Latuda prescription was refilled and Plaintiff was asked to follow-up with Dr. Williams in one month.

On March 4, 2018, Plaintiff was seen in the Johnson Regional Medical Center emergency room complaining of seizure activity. (Tr. 523-527). Plaintiff reported he had been out of his medication since February 28, 2018. Plaintiff reported his seizures, which consisted of a twitching

activity for about thirty seconds, started two days ago. Plaintiff reported he owed his primary care physician money so he could not be seen for a medication refill appointment. Plaintiff's severity of symptoms was noted as mild and he had no pain. Plaintiff was treated, prescribed Vistaril and instructed to follow up with his primary care physician. Plaintiff was reminded that chronic health problems were not to be treated in the emergency room.

On April 17, 2018, Plaintiff was seen by Dr. Williams complaining of an addiction. (Tr. 448-450). Plaintiff also needed medication refills. An examination of Plaintiff was unremarkable. Dr. Williams prescribed medication and gave Plaintiff information regarding Narcotics Anonymous.

On May 21, 2018, Plaintiff was seen by Holli Shelton, LPC, at Dayspring for an intake and treatment planning. (Tr. 468-479). Ms. Shelton noted Plaintiff's report that he was irritable and barely left his home due to anxiety. Plaintiff reported he was diagnosed with schizophrenia at the age of twenty-two and that his symptoms had increased over the past ten years but he had not had schizophrenia symptoms since starting on medication two months ago. Prior to taking this medication, Plaintiff reported experiencing auditory and visual hallucinations. Plaintiff reported he experienced daily panic attacks. Plaintiff reported that he was Pentecostal but did not attend meetings. Ms. Shelton noted Plaintiff was trying to obtain SSI. Plaintiff reported he was good at fixing computers and did this with his free time. Plaintiff indicated he only liked to be around his family. Ms. Shelton noted Plaintiff could read well and had obtained his GED.

On May 29, 2018, Plaintiff was seen by Veronica Morton, ANP, at Dayspring for an initial psych diagnosis. (Tr. 462-466). Plaintiff reported he constantly heard voices that degraded him. Plaintiff indicated his panic consumed him. Plaintiff reported he had no drive to do anything and had gone up to one month without taking a bath. Plaintiff reported he was diagnosed with

11

schizophrenia at the age of twenty-two and that both his mother and maternal grandmother had schizophrenia. Plaintiff reported he completed the eighth grade. Plaintiff reported he was married and had one daughter and one step-daughter. Nurse Morton noted Plaintiff lived with his dad, wife, and step-daughter. Plaintiff denied substance abuse or alcohol problems. Plaintiff reported he was previously arrested several years ago for child support issues. Plaintiff denied any medical issues. Upon examination, Nurse Morton noted Plaintiff had normal speech, a depressed mood, an appropriate affect, and intact thought. Plaintiff was found to have intact social skills. Plaintiff was prescribed medication and instructed to attend therapy sessions twice a month.

On June 20, 2018, Plaintiff was seen by Dr. McAuley for low back pain, hearing problems, anxiety, and panic attacks. (Tr. 446). An examination of Plaintiff was unremarkable.

On July 24, 2018, Plaintiff was seen by Dr. McAuley for a check-up and medication refill. (Tr. 443-445). Plaintiff complained of weight gain and anxiety problems. Dr. McAuley assessed Plaintiff with anxiety. Dr. McAuley noted Plaintiff had requested a refill for Alprazolam. Dr. McAuley told Plaintiff that after discovering another doctor in Texarkana had prescribed Plaintiff Alprazolam the clinic would no longer refill any controlled medication. Dr. McAuley noted Plaintiff started panicking about his anxiety and was told there were several other options. Plaintiff was to follow-up in three months.

On July 31, 2018, Plaintiff was seen by Nurse Morton for a medication check. (Tr. 460-461). Nurse Morton noted Plaintiff indicated he was not doing well and that his anxiety was worse. Plaintiff reported he had changed his diet and was walking more. Plaintiff indicated the voices in his head had decreased. Nurse Morton noted a review of the prescribing system indicated Plaintiff had not refilled his Latuda since May 30, 2018, and that Plaintiff had not attended therapy since May 29, 2018. Plaintiff was not sure about this as he thought he had been taking all of his

medications. Nurse Morton explained to Plaintiff that the combination of medication and therapy would assist him with coping and managing his mental health issues. Plaintiff verbalized understanding. Upon evaluation, Nurse Morton noted Plaintiff maintained good eye contact and exhibited normal and cooperative behavior. Nurse Morton noted Plaintiff's report of auditory hallucinations. Plaintiff's attention and concentration were noted as focus intact. Plaintiff was prescribed medication and reminded of the importance of attending therapy. Nurse Morton opined Plaintiff's progress was good.

On October 22, 2018, Plaintiff underwent a mental diagnostic evaluation with medical assessment performed by Dr. Steve A. Shry. (Tr. 528-529). Dr. Shry noted Plaintiff was one hour early for his session and was brought to the appointment by his father. When asked to describe his symptoms, Plaintiff reported that he had to live with his wife and his dad because he had bad thoughts of wanting to hurt people. Plaintiff reported voices told him to hurt himself and others. Plaintiff reported his dad allowed him to just sit around the house. Plaintiff indicated if he did not take his medication, he would feel like he wanted to hurt someone. Plaintiff reported he sometimes went to the emergency room four times in one day due to chest pian caused by his anxiety. Dr. Shry noted the evaluation was terminated after Plaintiff reported he was unable to answer questions. Dr. Shry noted it was unclear if Plaintiff was unmotivated, demonstrating significant symptoms of side effects from medications and/or demonstrating significant symptoms of a mental disorder or impairment. Dr. Shry indicated Plaintiff was either non-compliant or unable to comply with questions and testing. Dr. Shry opined the evaluation was invalid and unreliable.

### III. Applicable Law:

The Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by

substantial evidence on the record as a whole." Combs v. Berryhill, 878 F.3d 642, 645-46 (8th Cir. 2017). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." Id. The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." Id. The Court will not reverse an administrative decision simply because some evidence may support the opposite conclusion. Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. Id.

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy

given his age, education, and experience. See 20 C.F.R. § 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920.

### IV.　Discussion:

Plaintiff argues the following issue on appeal: 1) the ALJ "erred in failing to fully and fairly develop the record, including the ME record or testimony review in light of the aborted MSCE"; 2) the ALJ erred in assessing the credibility of Plaintiff's subjective complaints; and 3) the ALJ erred in determining Plaintiff's RFC which is unsupported by either examining or treating source opinion evidence.

#### A.　Full and Fair Development of the Record:

Plaintiff argues that the ALJ erred by failing to obtain more information regarding Plaintiff's mental functioning.

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir.1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

The record in this case includes the assessment of non-examining medical consultants, treatment notes from Plaintiff's healthcare providers, and hearing testimony. A review of the record revealed that after the administrative hearing in September of 2018, the ALJ sent Plaintiff to Dr. Shry to undergo a consultative mental status evaluation. On October 22, 2018, Dr. Shry stopped the evaluation soon after it started because Plaintiff was unable to answer questions. Dr. Shry opined Plaintiff was either non-compliant or unable to comply with questions and testing that day. The ALJ addressed Dr. Shry's assessment in the administrative hearing decision, setting forth the weight given and the reasoning behind that determination. It is permissible for the ALJ to make a disability determination without obtaining additional evidence as long as the evidence of record provides a sufficient basis for the ALJ's decision. Haley v. Massanari, 258 F.3d 742, 749-50 (8th Cir. 2001). Upon review, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period. Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

**B**. **Subjective Complaints and Symptom Evaluation:**

We now address the ALJ's assessment of Plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's]

credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. A review of the record revealed that Plaintiff routinely reported that he enjoyed working with computers. Plaintiff reported that he was able to play video games and that he often watched television. The record further revealed that Plaintiff tried to help his wife with her therapy appointments and even discussed with his therapist how his wife expected him to take care of everything. While Plaintiff did not turn in the Functional Report with his disability application, the record is void of any discussion that Plaintiff was unable to take care of activities of daily living independently. In fact, on at least two occasions during the time period in question, Plaintiff was able to drive himself to the emergency room to seek treatment and was stable enough to be discharged unaccompanied to drive himself home.

With respect to Plaintiff's alleged impairments, the record revealed that Plaintiff was treated conservatively and appeared to experience some relief with the use of medication. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998); See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain). The record revealed that when Plaintiff took his medications as prescribed his symptoms stabilized. While Plaintiff reported hearing voices in July of 2018, Nurse Morton noted that unbeknownst to Plaintiff he had not filled one of his medications. There is no evidence that Plaintiff intentionally failed to take this medication. At this July of 2018, appointment, Nurse Morton noted Plaintiff maintained good eye contact, had a cooperative attitude, had normal behavior, and had intact attention and concentration. Nurse Morton also noted Plaintiff's progress was good.

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he was unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible for the time period in question.

      C.      **The ALJ's RFC Determination and Medical Opinions:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered the medical assessments of examining and non-examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform work at all exertional levels but with non-exertional limitations. The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of non-examining and examining medical professionals, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the

ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole). The ALJ also took Plaintiff's obesity into account when determining Plaintiff's RFC. Heino v. Astrue, 578 F.3d 873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal). After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

### D. Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a hand packager, a conveyor feeder off-bearer, and a kitchen helper. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### V. Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal**

**questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 5th day of  February 2021.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE